**Angela EDWARDS, Plaintiff–Appellant,**

v.

**COMMISSIONER OF SOCIAL SECURITY, Defendant–Appellee.**

No. 15–3546.

United States Court of Appeals, Sixth Circuit.

Jan. 19, 2016.

On Appeal from the United States District Court for the Southern District of Ohio.

Before: GUY, SUTTON, and McKEAGUE, Circuit Judges

RALPH B. GUY, JR., Circuit Judge.

Angela Edwards brought this action for review of the Commissioner's final decision denying her applications for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Edwards argues that the decision failed to properly weigh certain treating source medical opinions and, therefore, was not supported by substantial evidence. The district court rejected plaintiff's contentions, and we affirm.

## I.

Edwards applied for DIB and SSI in October 2007, alleging disability beginning April 1, 2006, at age 41, due to physical and mental impairments. Edwards, who did not complete 12th grade or obtain a GED, had past relevant work experience as a customer service representative, telemarketer, housekeeper, and factory packer. After her applications were denied initially and upon reconsideration, a hearing was held before an administrative law judge (ALJ) on January 26, 2010. The ALJ issued a partially favorable decision finding that Edwards was not disabled prior to January 14, 2010, but that her worsened mental condition rendered her disabled as of January 14, 2010. Granting Edwards' request for review, the Appeals Council vacated that decision and remanded for further consideration and reassessment of her residual functional capacity. In doing so, the Appeals Council stated that it was "not clear in light of the medical evidence of record that the residual functional capacity assessment in the hearing decision represent[ed] the most the claimant can do despite her impairments."

A second hearing was held before a different ALJ on April 4, 2012. Further medical evidence was provided, Edwards testified again, and testimony was received from another medical expert and a different vocational expert. Employing the familiar five-step sequential evaluation process required by 20 C.F.R. §§ 404.1520 and 416.920, the ALJ concluded that Edwards had not been under a disability within the meaning of the Social Security Act since the date of her applications for DIB and SSI.

In that decision, the ALJ found Edwards had severe impairments consisting of degenerative joint disease in the knees (status post-bilateral arthroscopic surgeries), obesity (post-gastric bypass surgery), lumbar spondylosis, affective disorder, anxiety disorder, and estimated borderline intelligence. Edwards has not challenged the ALJ's determination that her impairments, considered singly and in combination, did not meet or equal the severity of any listed impairment. *See* 20 C.F.R., pt. 404, subpt. P, app. 1, 1.04A (spine), 1.02A (knees), 1.00(B)(2)(b) (inability to ambulate effectively), 12.04 (affective disorders), and 12.06 (anxiety disorders); 20 C.F.R.

§§ 404.1525–1526, 416.925–926.[1]

After weighing the evidence, the ALJ determined that Edwards retained the physical capacity to perform work activities that required her to lift/carry or push/pull no more than 20 pounds occasionally and 10 pounds frequently; stand/sit/walk for six hours in an eight-hour day with normal breaks; never crawl, climb ladders or scaffolds, or work at unprotected heights or around hazardous machinery; and only occasionally stoop, kneel, crouch, or climb ramps or stairs. In addition, the ALJ found that Edwards could only per-. form work that involved simple, routine, or repetitive tasks that did not require a rapid pace, more than ordinary changes in setting or duties, or more than minimal interaction with coworkers, supervisors or the public. Finally, given her age, limited education, and residual functional capacity, the ALJ concluded that Edwards could perform both her past relevant work as a factory packer and other unskilled light work that exists in the national economy (*i.e.*, inspector, folder/stacker, and machine tender). That became the final decision of the Commissioner when the Appeals Council denied review, and this action followed.

The magistrate judge reviewed Edwards' claims of error and recommended reversal on the grounds that the ALJ had failed to comply with the "treating source rule." Concluding otherwise, however, the district court sustained the Commissioner's objections, declined to adopt the magistrate judge's report and recommendation, and affirmed the Commissioner's denial of Edwards' applications for DIB and SSI. Edwards appealed.

## II.

The Commissioner determines whether a claimant is disabled within the meaning of the Social Security Act, and judicial review is limited to "whether the Commissioner's decision 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Ealy v. Comm'r of Soc., Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (quoting *Rogers v. Comm'r of Soc., Sec.*, 486 F.3d 234, 241 (6th Cir.2007)). Failure to follow the agency's own rules and regulations denotes a lack of substantial evidence, although violation of a procedural requirement may be deemed harmless error. *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir.2011). On appeal, the district court's conclusions on these issues are reviewed *de novo. Id.* at 937.

The agency's regulations require that a treating source's medical opinion concerning the nature and severity of a claimant's impairments be given "controlling weight" as long as it "[1] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and [2] is not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating source's opinion is not found controlling, the ALJ must determine the weight that it should be given based on a number of factors, including the length, frequency, nature, and extent of the treatment relationship, as well as the "area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart v. Comm'r of Soc., Sec.*, 710 F.3d 365, 376 (6th Cir.2013); *see* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

---

1. In reaching that conclusion, the ALJ evaluated the B criteria under Listings 12.04 and 12.06 and found that Edwards' mental impairments resulted in mild restriction in the activities of daily living; moderate difficulty maintaining social functioning; moderate difficulty maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.

As a procedural requirement, the ALJ must also provide "good reasons" for discounting the weight to be given to a treating source's opinion. *Gayheart,* 710 F.3d at 376. The reasons must be supported by the evidence in the record and sufficiently specific to ensure that the rule is applied and to permit meaningful review. *Id.* Edwards contends that the ALJ's reasons for discounting certain treating source opinions were insufficient because, as we explained in *Gayheart,* an ALJ may not apply more rigorous scrutiny to a treating source's opinion than to an examining or reviewing source's opinion "as a means to justify giving such an opinion little weight." *Id.* at 380.

■ Initially, as Edwards acknowledges on appeal, the ALJ did not err by declining to give controlling weight to the conclusory opinions reported by a number of treating sources on a succession of Department of Job and Family Services' "Request for Limited Medical Data" forms. Each of those forms simply listed Edwards' relevant diagnoses and indicated without explanation that she was unable to work for a period of twelve months from the date the form was completed. *See White v. Comm'r of Soc., Sec.,* 572 F.3d 272, 286 (6th Cir.2009) (recognizing that conclusory statements from medical sources may properly be discounted by an ALJ). Indeed, the regulations make clear that no special significance is to be given to the source of an opinion on issues that are reserved to the Commissioner—including statements that a claimant is "disabled" or "unable to work." *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). Those conclusory opinions were permissibly weighed based on factors such as the length, frequency, nature and extent of the treatment relationship.

■ Next, we find that the ALJ provided adequate reasons for discounting the extremely limited physical capacity assessment provided by treating physician Rafael Bloise, M.D., on January 8, 2010. Specifically, Dr. Bloise's assessment indicated that Edwards could only stand or walk for thirty minutes of an eight-hour workday; could only sit for thirty minutes of an eight-hour workday; could only lift up to ten pounds frequently and five pounds occasionally; and was moderately limited in her abilities to push, pull, bend, reach, handle, see, hear, speak and perform repetitive foot movements. However, although Dr. Bloise examined Edwards six times between July 2009 and October 2010, there were "no clinical findings in his treatment notes that would support such extreme limitations." Even on January 8, 2010, Dr. Bloise's physical examination did not include musculoskeletal or neurological assessments.

Nor do the treatment records from orthopedists James Abbott, M.D., and Jon Sulentic, D.O., from July 2008 through November 2009 lend greater weight to Dr. Bloise's functional capacity assessment. Edwards has osteoarthritis in both knees and underwent arthroscopic surgery for a torn medial meniscus first in the left knee in September 2008 and then in the right knee in March 2009. Edwards emphasizes, as she did at both hearings, that the surgical treatment notes confirmed bilateral degenerative joint disease with specific areas of moderate to severe chondromalacia (cartilage damage). A month after the first surgery, Dr. Abbott noted that Edwards was walking comfortably and reported no knee pain. Surgery on the right knee was less successful, and Edwards was seen for pain by Dr. Sulentic. Edwards declined referral to a pain clinic and received a total of three Supartz injections in October and November 2009. At the first hearing, medical expert Donald Junglas, M.D., an internist, testified that Edwards'

degenerative changes and obesity would cause discomfort but did not necessarily mean that she had more than mild arthritis.

Edwards, who weighed more than 300 pounds at the time of the first hearing, underwent gastric bypass surgery in November 2010, and had lost nearly 100 pounds at the time of the second hearing in April 2012. An x-ray of her right knee in August 2011 showed mild degenerative changes, and Edwards sought treatment from orthopedist Todd Kelley, M.D., in February 2012. Dr. Kelley ordered x-rays of Edwards' right knee that showed subtle arthrosis, small joint effusion, and joint space narrowing that was not previously well defined. Edwards reported that the weight loss had benefited her knee pain, and Dr. Kelley observed that she ambulated independently without an assistive device and had a mild to moderate antalgic gait. Her left knee had full range of motion and no effusion, while her right knee had mild effusion and crepitus with range of motion from 5 to 115 degrees. The following month, Dr. Kelley administered a cortisone injection in her right knee and offered to do so periodically as needed.

■ Finally, the ALJ provided adequate reasons for discounting the mental functional capacity assessments of: (1) treating psychologist Steve Warkany, M.Ed., M.S.E., dated October 3, 2007; and (2) treating psychiatrist Anthony Whitaker, M.D., dated January 14, 2010. Edwards argues that the ALJ improperly discounted these two treating source opinions because they were based on self-reports during clinical interviews. This court has explained that when "mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology." *Blankenship v. Bowen*, 874 F.2d 1116,

1121 (6th Cir.1989) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873–74 (D.C.Cir. 1987)). Also, "[t]he report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques." *Id.*

Mr. Warkany's functional capacity assessment dated October 3, 2007, was provided after Edwards was referred to Core Behavioral Health for mental health treatment following a visit to the psychiatric emergency services in August 2007 for depression, insomnia, auditory hallucinations, suicidal thoughts, and superficial cuts to her forearms. Mr. Warkany's assessment opined that Edwards was markedly limited in "her ability to maintain attention and concentration, perform at a consistent pace, get along with coworkers and respond to changes in the work setting." The basis for his assessment was identified only as "interviews with clinicians" without specifying to whom that referred, but the ALJ considered the possibility that Mr. Warkany was referring to himself since he had been the clinician who signed the initial intake assessment of Edwards dated September 26, 2007. Assuming that was the case, however, the record of that initial intake assessment did not reflect self-reports or clinical observations regarding her functional limitations beyond stating the diagnoses of bipolar disorder (most recent episode depressed), personality disorder NOS, and a current Global Assessment Functioning (GAF) score of 50 with a high in the past year of 55.

The ALJ explained that he gave more weight to the consultative psychological evaluation by Richard Sexton, Ph.D., dated December 11, 2007, because it contained the most thorough mental status examination in the file. That evaluation was based

on his examination, as well as Edwards' self-reports regarding her ability to live independently, care for herself, perform regular household chores, and maintain a few friendships. Dr. Sexton concluded that Edwards was capable of performing simple repetitive tasks, was able to carry out simple instructions, and was mildly impaired in her ability to interact with others and tolerate daily work stress. The ALJ also gave significant weight to the opinion of Alice Chambly, Psy.D., who reviewed the record for the state agency in January 2008. Dr. Chambly opined that Edwards was capable of performing simple routine tasks that have low production standards and require no more than superficial interactions with coworkers, supervisors, or the public.

Dr. Whitaker provided a mental residual functional capacity assessment just before the first hearing in January 2010, which indicated that Edwards was markedly limited in many work-related functions and moderately limited in the rest. Dr. Whitaker also signed an incomplete mental impairment questionnaire for counsel dated January 19, 2010, which concluded that Edwards would miss more than four days of work per month. Dr. Whitaker's opinions were based on Edwards' initial visit on January 14, 2010, when he diagnosed bipolar disorder with antipsychotic features, antisocial personality disorder, panic disorder, PTSD, and ADHD. However, Dr. Whitaker provided an incomplete questionnaire that did not identify signs or symptoms or rate any of the Paragraph B criteria.[2]

Further, psychiatrist Alfred Jonas, M.D., the medical expert who testified at the hearing in April 2012, disagreed with Dr. Whitaker's suggestion that Edwards experienced "thought broadcasting," and found no support in the record for the diagnoses of antisocial personality disorder or ADHD. Dr. Jonas testified that Edwards should be limited to work involving simple routine tasks that did not require a lot of social interaction. Despite Edwards' assertion on appeal, it is a misreading of *Rogers,* 486 F.3d at 245, to suggest that a reviewing opinion may be given greater weight than a treating source's opinion *only if* it relies on a report from a specialist that was not available to the treating source. *See* SSR 96–6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); 20 C.F.R. § 404.1527(e)(2)(i)-(ii) (evaluation of non-examining medical expert opinion).

Review of the record as a whole reveals that the ALJ addressed the relevant evidence and provided adequate reasons for discounting the treating source opinions relied upon by Edwards in assessing her residual functional capacity for work-related activities.

**AFFIRMED.**

---

**2.** Edwards has abandoned reliance on an assessment that was signed by Dr. Whitaker "for Dr. Rahman" and dated March 9, 2012, which noted that Dr. Whitaker had just seen Edwards on March 7, 2012, but had otherwise not seen her since the initial visit on January 14, 2010.