NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0472n.06

No. 15-2364

**FILED**
Aug 16, 2016
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ROBERT GIBBENS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| COMMISSIONER OF SOCIAL SECURITY, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

BEFORE:    GILMAN, WHITE, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**    Appellant Robert Gibbens challenges the decision of the Commissioner of Social Security to deny his claim for disability benefits. He contends that the administrative law judge who presided over his hearing erred by (1) rejecting the medical opinion of his treating physician, and (2) formulating hypothetical questions for the vocational expert that did not accurately reflect his limitations in concentration, persistence, and pace. Because the Commissioner's decision is supported by substantial evidence, we AFFIRM the judgment of the district court.

## I.    PROCEDURAL HISTORY

Gibbens applied for disability insurance benefits on June 27, 2007, and supplemental security income on October 2, 2007, alleging disability since March 1, 2006. At the time, he was twenty-five years old. Gibbens claimed that conditions in his lower back, left arm, and right knee limit his ability to work, as do attention deficit disorder and a learning disability. In a

disability report filed a few months later, he noted a further decline in memory and physical condition that reduced his ability to care for himself or his children.

Gibbens's application was denied initially in January 2008, and by decision after an administrative hearing in October 2009. The Appeals Council vacated the decision and remanded with instructions to the administrative law judge (ALJ) to further evaluate Gibbens's mental impairment and obesity, consider his residual functional capacity with "specific reference to evidence of record in support of the assessed limitations," and to obtain evidence from a vocational expert clarifying the effect of these limitations on his ability to work.

A second ALJ presided over the hearing on remand and denied Gibbens's application for benefits at the final step of the disability analysis. The ALJ concluded that, despite Gibbens's severe impairments and significant functional limitations that precluded past relevant work, Gibbens retained the capacity to perform a limited range of sedentary work. The Appeals Council denied Gibbens's request for review on July 1, 2014, making the ALJ's decision the final decision of the Commissioner of Social Security. The district court affirmed.[1]

## II.     FACTS

As the result of a brachial plexus injury at birth, Gibbens is afflicted by Erb's Palsy of the left upper extremity, which causes deformation and decreased mobility. Gibbens has also been diagnosed with borderline intellectual functioning and a probable learning disability. He completed the eleventh grade and asserts that he attended special education classes throughout school. Gibbens states that he intended to pursue his GED at one point, but did not think he could do it and was unable to after starting a family.

---

[1]Gibbens's motion for summary judgment before the district court claimed that the ALJ erred on four counts, but only two of those form the basis of his appeal. We generally do not review arguments raised before the district court but not raised on appeal, thus only the two issues before us are considered. *See, e.g.*, *Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998).

Gibbens has been married since 2003 and lives with his wife and two children. He enjoys a good relationship with family and visits with friends regularly. Gibbens requires assistance with things like bathing and tying his shoes because he has little to no use of his left arm and hand. However, he is able to help care for his children and complete some household chores. Gibbens likes to watch television and use the computer. He takes naps frequently because he suffers from sleep apnea and fatigues easily due to persistent pain. Since the alleged onset of his disabling conditions, Gibbens has intermittently relied on a cane or walker to ambulate. His wife handles the family's finances.

Gibbens worked as a cart pusher and truck unloader at Walmart from approximately 2004 to early 2006, but quit due to back and arm pain. He then worked briefly in another manual labor position until approximately May 2006.[2] He has not worked since this time.

## A.    Medical History

In 2007, Gibbens experienced growing discomfort in his left arm and fingers from numbness and tingling that dissipated when he shook his hand. A subsequent examination, which included a nerve conduction study and electromyography (EMG), revealed abnormality in his median, ulnar, and left radial nerves, as well as chronic denervation.

Gibbens first met with his treating physician, Dr. Katalin Szloboda, in June 2012. Dr. Szloboda noted that Gibbens was morbidly obese and had been diagnosed with type II diabetes the previous year. An MRI administered the following week indicated that Gibbens suffered from multilevel lumbar spondylosis. Despite these challenges, Gibbens's condition appears to have improved under Dr. Szloboda's care. At a July 2012 follow-up examination, Dr. Szloboda observed that Gibbens's diabetes was "doing much better" now that he was on a good diet, losing weight, and taking his medications. Gibbens's arthritis also improved, but he continued to

---

[2]Gibbens stated elsewhere in the record that he worked until 2003, but this appears to be a misunderstanding.

experience significant back pain. Dr. Szloboda referred Gibbens to neurosurgeon Dr. Coccia, who determined in fall 2012 that Gibbens's symptoms were not related to degenerative disc disease and that surgery was unnecessary. Dr. Coccia recommended possible epidural injections and physical therapy for pain management.

A short time after his neurosurgery evaluation, Gibbens was sent to the emergency room when he experienced a sudden onset of weakness and numbness in both legs after he "felt a pop" while getting into his car. He rated his pain around that time as nine on a ten-point scale. Gibbens was discharged with a prescription for physical therapy and noted "some significant improvement" after one month, including decreased pain and greater mobility. Two months later, he was described as "doing well," and reported that he never felt pain beyond a five or six, though he continued to experience numbness in his lower legs. An EMG taken around this time revealed no significant abnormality.

Gibbens underwent a cervical fusion in January 2013. When he was discharged the following day, "[h]is preoperative pain ha[d] mostly resolved." At the time of the hearing, Gibbens had not yet seen the surgeon for a follow-up evaluation. The record contains no significant medical events after this date.

**B.      The Administrative Hearing**

Gibbens testified at the administrative hearing that, although he had always suffered pain in his neck, shoulders, lower back, and knees, his condition had worsened since 2009 when he began seeking treatment from specialists. He testified that his wife helped him bathe, that he could not drive long distances, clean, shop, or do laundry, and that he could cook only "very little." Gibbens visited the emergency room three times between 2009 and 2010 for pain in his neck, shoulders, and upper back. He testified that he did not think the cervical fusion procedure the month prior had helped, though he understood that it was still early and that he may yet

regain feeling in his legs. Gibbens noted that he did not like to go out because people stare at him. Finally, he explained that his chronic pain, lower extremity numbness, and fatigue were particularly troubling because they kept him from spending time with his children.

The ALJ posed three hypothetical questions to a vocational expert. First, he described a person of Gibbens's age, level of education and work experience, who is,

> unable to lift and carry more than 10 pounds frequently, 20 pounds occasionally, would be unable to climb ladders, ropes, and scaffolds, unable to have effective use of left upper extremity, that's non-dominant. . . .

> Unable to climb stairs, balance, stoop, kneel, crouch or crawl more than occasionally, would need to avoid concentrated exposure to vibration and hazards, would be unable to maintain the attention or concentration necessary to perform detailed or complex tasks. And unable to have more than occasional interaction with co-workers, supervisors, or the public.

The vocational expert confirmed that there was work available that a hypothetical individual with these limitations could perform, including order filler, shipping clerk, and production inspector.

The ALJ then asked the vocational expert to consider the same hypothetical individual with the added limitations that he could not lift or carry more than ten pounds, could not stand or walk for more than two hours during an eight-hour workday, and would require use of a cane to walk. The vocational expert responded that there were jobs available in the economy for this hypothetical individual including packer, inspector, and production helper. Finally, the ALJ added a last limitation to both of the prior hypotheticals—the individual required unscheduled breaks of undetermined duration. The vocational expert testified that this limitation would preclude all competitive employment.

Gibbens's attorney asked the vocational expert to consider the first hypothetical individual with the added limitation that he could "not do any report completion, even to the

point of counting, and no use of computers, [or] laptops for operation." The vocational expert found that this would eliminate some of the representative examples he had offered, like shipping clerk positions, but that the hypothetical individual could still work in positions like order filler or production inspector. The ALJ asked whether those positions were still available if the same hypothetical individual required a cane to ambulate. The vocational expert responded that this limitation eliminated employment.

## C.     The Decision of the Social Security Commissioner

The ALJ denied Gibbens's claim for benefits in a written decision on April 3, 2013. He noted as a preliminary matter that Gibbens met the insured status requirements of the Social Security Act until September 20, 2011. At the first step of the sequential evaluation process, 20 C.F.R. §§ 404.1520(a), 416.920(a), the ALJ found that Gibbens had not engaged in substantial gainful activity since the alleged onset of his disability on March 1, 2006. At the second step, the ALJ concluded that Gibbens suffered from several severe impairments, including Erb's Palsy of the left upper extremity, obesity, peripheral neuropathy, diabetes, cervical and lumbar degenerative disc disease, general anxiety disorder, attention deficit hyperactivity disorder, dysthymia, and borderline intellectual functioning. At step three, the ALJ determined that Gibbens's impairments, or combination of impairments, did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

The ALJ found at step four that Gibbens retained the residual functional capacity to perform sedentary work with a number of nonexertional limitations:

> unable to have effective use of the left upper extremity except to assist the right with lifting; unable to climb ladders, ropes or scaffolds; only occasional balancing, stooping, kneeling, crouching or crawling; must be able to use a cane to ambulate; must avoid concentrated exposure to vibration or hazards; unable to maintain

> the attention or concentration necessary to perform detailed or complex tasks; only occasional interaction with co-workers, supervisors or the public.

The ALJ found that Gibbens's medically determinable physical and mental impairments could reasonably be expected to cause the symptoms he alleged, but that Gibbens's statements concerning their intensity, persistence, and limiting effects were not entirely credible. In particular, the ALJ gave little weight to the opinion of Gibbens's treating physician, Dr. Szloboda, because her assessment was not supported by objective medical evidence.

At step five, the ALJ concluded, based on the testimony of the vocational expert, that significant numbers of jobs existed in the regional and national economy that Gibbens could perform. Though Gibbens could not perform his past relevant manual labor work, his status as a younger individual, 20 C.F.R. §§ 404.1563, 416.963, and his residual functional capacity in conjunction with the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, indicated that he could perform a range of light work. Thus, the ALJ concluded that Gibbens was not eligible for benefits and denied his application.

The Appeals Council denied Gibbens's request for review. The district court affirmed.

### III.       ANALYSIS

The district court's disability benefits determination is reviewed de novo. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013). We uphold the Social Security Commissioner's decision if it "is supported by substantial evidence" and "made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence lies between a preponderance and a scintilla; it refers to relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Id.* Even if an ALJ's findings are justified on the record, a "failure to follow agency rules and regulations denotes a

lack of substantial evidence." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (internal quotation marks omitted).

The Social Security Act defines a person who is "disabled" as one whose "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To qualify, a claimant must establish the existence of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than twelve months, and that such impairment(s) render such claimant unable to engage in any substantial gainful activity. *Id.* § 423(d)(1)(A).

### A.    The Treating Physician's Opinion

Due to the unique nature of the "ongoing treatment relationship" between a patient and his doctor, the medical opinion of an applicant's treating physician is afforded special consideration under the Social Security Act. *See* 20 C.F.R. §§ 404.1502, 404.1527(c)(2). The Act recognizes that a treating physician is best placed "to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)" and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* § 404.1527(c)(2).

A treating physician's opinion on the nature and severity of a claimant's impairment(s) is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* If not, the ALJ evaluates the opinion with reference to a number of factors

including: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2) (listing factors). The ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

Gibbens contends that the ALJ erred by rejecting the opinion of his treating physician, Dr. Szloboda. Although the ALJ stated explicitly that he afforded Dr. Szloboda's opinion little weight based on four discrete reasons, Gibbens asserts that the ALJ did not satisfy the treating physician rule because his justifications were cherry-picked from the record, do not address the enumerated regulatory factors, and do not constitute "good reasons." *See* 20 C.F.R. § 404.1527(c)(2) (requiring a decision to provide "good reasons" when controlling weight is not given to a treating source opinion); *see also Cole*, 661 F.3d at 937 (explaining the good reasons requirement is a "safeguard [on] the claimant's procedural rights," and more than "simply a formality"). Failure to comply with the treating physician rule requires reversal, even when "substantial evidence otherwise supports the decision," unless the error is harmless. *Wilson*, 378 F.3d at 544, 547; *see also Cole*, 661 F.3d at 940 (noting circumstances in which violation of the rule may constitute harmless error).

Dr. Szloboda submitted two letters in support of Gibbens's disability claim. The first, written in December 2012, six months after Dr. Szloboda began treating Gibbens, states

generally that Gibbens is "unable to keep a meaningful job because of his condition"—which she noted included diabetes, low thyroid, degenerative disc disease causing chronic pain, peripheral neuropathy, weakness in the lower extremities, and Erb's palsy—and that he should be considered for disability. Two months later, Dr. Szloboda followed up with a second letter in which she reiterated Gibbens's medical conditions in slightly more detail and predicted that, despite undergoing a cervical fusion the month before, the neurological symptoms that Gibbens had experienced for years would continue "for the foreseeable future." Dr. Szloboda opined that, "[b]ased upon all of his conditions and physical limitations and restrictions, he should be eligible for social security disability."

Dr. Szloboda attached a physical residual functional capacity assessment to the second letter that listed the following exertional limitations: no use of left arm, lift or carry less than ten pounds in right arm, stand or walk for a total of less than two hours in an eight-hour work day, and sit for a total of one to two hours in an eight-hour workday. The assessment further noted that Gibbens could never climb, balance, kneel, crouch or crawl, but could occasionally stoop, and that he had limited manipulative abilities. However, no visual or communicative limitations were listed.

The ALJ listed four reasons for giving Dr. Szloboda's opinion little weight. First, he found that the record evidence did not support her opinion regarding Gibbens's neuropathy. As stated in her second letter: "As a result of [Gibbens's] diabetes as well as contributed to by his degenerative disk [sic] disease, he has peripheral neuropathy and weakness in both lower extremities. This was tested by EMG." In fact, the EMG, performed after Gibbens began to experience increasing lower back pain and numbness from the waist down, "failed to reveal significant abnormality." Dr. Johnson, who administered the EMG, observed that "[t]he etiology

of [Gibbens's] symptoms remains uncertain." He was unable to find the signs of large fiber neuropathy and, while small fiber neuropathies could "be elusive on EMG," this also seemed "less likely" given the position of Gibbens's symptoms. Dr. Johnson concluded the case was "somewhat quizzical."

In light of Dr. Johnson's interpretation, Dr. Szloboda's reference to the EMG provides little support for her diagnosis of neuropathy; the ALJ found it "difficult to understand Dr. Szloboda's conclusion, regarding her diagnosis of neuropathy, when the EMG gives no basis for it." To the extent that her opinion was "based (at least in part) on the erroneous assumption that an EMG supports a finding of neuropathy, when it does not," the ALJ gave little credit to Dr. Szloboda's opinion on this count.

Gibbens maintains that Dr. Szloboda's reference to the EMG is not an "erroneous statement." He notes that the EMG results indicated vibratory sensation loss, and that small-fiber neuropathy is difficult to diagnose in this manner. Although the EMG produced negative results, "it could not establish conclusively the source of Gibbens'[s] neuropathy," and no medical expert has explicitly disagreed with that diagnosis, thus, Gibbens concludes that "the AJL's finding is, at best, speculative."

Gibbens misunderstands the ALJ's concern on this count. The ALJ did not dispute the neuropathy diagnosis—in fact, he found it to be a severe impairment. Instead, Dr. Szloboda's citation to the EMG, which did not support the referenced diagnosis, indicates that her medical opinion—at least insofar as it concerns neuropathy—is not supported by a clinical diagnostic technique. *See* 20 C.F.R. § 404.1527(c)(2). Moreover, this aspect of her opinion is inconsistent with other substantial evidence in the medical record, specifically Dr. Johnson's finding that the EMG results were normal and that small fiber neuropathy, though difficult to detect, was "less

likely" given the location of Gibbens's symptoms. The ALJ's reasoning on this point is supported by substantial evidence and satisfies the good reasons requirement for giving less weight to Dr. Szloboda's opinion. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) (noting that the ALJ's decision "is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ").

The second reason that the ALJ afforded Dr. Szloboda's opinion little weight is that her prognosis regarding Gibbens's upper extremity pain failed to take into account Gibbens's recent cervical discectomy, which the ALJ concluded "should alleviate some, if not all of his upper extremity pain." Gibbens's January 2013 cervical discectomy and fusion was undertaken to address his severe C6-7 cervical spinal stenosis and mild cord compression, which he reported caused growing pain in his shoulders and arms during the year prior. Evidence in the record indicates that the operation was a success. When Gibbens was discharged the following day, he was able to walk and reported that his preoperative pain had "mostly resolved," though he had some residual pain related to surgery. With this in mind, Dr. Szloboda's assessment made the following month that Gibbens would continue to experience his preoperative symptoms "for the foreseeable future" is puzzling, particularly in the absence of any explanation as to why she thought the discectomy and fusion would have no ameliorative effect.

Gibbens contends that the ALJ's assertion amounts to "playing doctor" because the ALJ substitutes his own medical findings for those of Gibbens's treating physician. An ALJ may not "play doctor." However, the post-surgery records support the ALJ's conclusion. Though Gibbens testified at the administrative hearing that he saw no change in his condition, he agreed that it was early to judge while he was still healing. Moreover, we read the ALJ's finding on this

issue in the context of other record evidence, described above, that indicates Gibbens's degenerative disc disease has often been manageable. Substantial evidence supports the ALJ's reasoning.

The third reason that the ALJ declined to give Dr. Szloboda's opinion controlling weight was the lack of evidentiary support for her physical residual functional capacity assessment, specifically, the exertional limitation that Gibbens could sit for only one to two hours per day. Instead, the ALJ found Gibbens's "lumbar degenerative disc disease is rather mild with no evidence of neurological abnormalities." He found little record support for Dr. Szloboda's assessment that Gibbens could sit for only one to two hours in an eight-hour workday. In response, Gibbens directs the court to the many instances in the record where his disc degeneration is characterized as severe and notes that "no one stated that his lumbar spine problem[s] were mild."

The record is split on this point. A June 2012 examination and MRI revealed lumbar spondylosis and moderate-to-severe central canal stenosis at L4-5. But in a July examination, Dr. Szloboda characterized Gibbens, while in distress due to back pain, as "otherwise doing pretty well." In October of the same year, Dr. Szloboda reported that she did not think Gibbens's "mild amount of stenosis at the L4-5 level is directly related to his clinical symptoms." She noted that Dr. Coccia, who did not think surgery was necessary, agreed with her and had characterized Gibbens's complaints as "diffuse and nonspecific." Around that time, Gibbens went to the emergency room complaining of weakness and numbness in both legs after he injured himself getting out of a car. His condition improved significantly after physical therapy, which helped him to walk more easily and increased his spinal flexibility. Yet, he did not regain

full sensation below the knees. By the end of 2012, Gibbens reported during an examination that he was "doing well" and never experienced pain beyond five or six on a scale of ten.

Our review of this mixed evidence is not intended to minimize Gibbens's ordeal. The mere presence of "periodic improvements and cessation of treatment" cannot support an ALJ's decision to discount the severity of a claimant's medical condition when the ALJ fails to consider other record evidence of declining health. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-24 (6th Cir. 2014) (holding that the ALJ erred by discounting claimant's impairments on the basis that she ceased certain treatments where her decision to go without those prescriptions was driven by serious side effects of her medication rather than recovery). However, that is not the circumstance in the present case. Our standard of review requires that we uphold the Commissioner's decision if it is supported by substantial evidence—as long as a reasonable mind might accept the proffered evidence as adequate to support the ALJ's determination. *Rogers*, 486 F.3d at 241. That standard is met here.

The fourth and final reason that the ALJ declined to give controlling weight to Dr. Szloboda's opinion is that her assessment of his limitations differed from the opinion of the state agency consultant. The physical residual functional capacity assessment completed by consultant Dr. Tanna in early 2008 noted that Gibbens could perform unskilled light work that did not require the use of his left arm, only occasional overhead reaching with his right arm, and that allowed for use of a cane during prolonged ambulation.

The ALJ acknowledged that Dr. Tanna's assessment was made five years prior to the hearing, but gave it significant weight because there was "little evidence that [Gibbens's] objective medical condition has changed much in recent years." This is not to say that Gibbens experienced no changes to his health in the intervening time. As acknowledged in the decision,

Gibbens experienced both increasing pain and periods of respite. He went to the emergency room three times for neck pain and once for numbness in his legs. He saw multiple specialists and underwent a cervical fusion. However, Gibbens also gained control of his diabetes and lost weight, experienced a decrease in back pain from a nine on a scale of ten to five or six, and improved his gait significantly with the help of a physical therapist.

On this record, reasonable minds could conclude that the evidence supports Dr. Tanna's opinion regarding Gibbens's physical limitations over Dr. Szloboda's more restrictive functional limitations. The record as reviewed by Dr. Tanna in January 2008 included the immediately preceding physical examination performed by medical consultant Dr. Abel in December 2007, and conforms to that opinion. Dr. Abel observed full grip and pincher grasp in Gibbens's right hand with only mild digital dexterity loss, normal gait without assistance, and no difficulty heel-toe walking, balancing, squatting, or rising. Dr. Abel further indicated that, although Gibbens had suffered back pain as a teenager and had never been able to use his left arm or shoulder, he was generally "independent with his activities of daily living," and could drive, prepare simple meals, perform some chores around the house, walk two blocks, and climb a flight of stairs. The opinions of two state psychological consultants prepared in 2006 and 2007 reached similar conclusions based on Gibbens's own reports of his abilities.

State agency medical consultants are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act"; thus, in some cases, "an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating . . . source." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (first alteration in original) (internal quotation marks omitted). We are more likely to uphold a decision to this effect when the consultant conducts an in-person examination

rather than formulating an opinion based solely on a review of the medical record. *See* 20 C.F.R. § 404.1527(c)(1). Where a non-examining source "did not review a complete case record, 'we require some indication that the ALJ at least considered these facts before giving greater weight'" to that opinion. *Miller*, 811 F.3d at 834 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009)).

The ALJ has satisfied this requirement. Though, as noted in the decision, Dr. Tanna's assessment was completed in 2008, the ALJ's own analysis clearly spanned the entire record— through the final degenerative changes to Gibbens's spine that culminated in a cervical discectomy and fusion, the last medical event included in the record. The decision was informed by both Dr. Tanna's assessment and the findings of Dr. Abel's complete physical examination, as well as medical evidence later entered into the record, including Dr. Johnson's interpretation of the EMG, the initial neurosurgery evaluation by Dr. Coccia and his notes following the 2013 surgery, and the observations of Gibbens's physical therapy team.

Finally, insofar as Dr. Tanna's assessment contradicts Dr. Szloboda's conclusion that Gibbens is eligible for Social Security benefits, Dr. Szloboda's opinion is not controlling. While "[a] doctor's conclusion that a patient is disabled from all work may be considered," it is not "given special significance because it may invade the ultimate disability issue reserved to the Commissioner." *Gentry*, 741 F.3d at 727 (internal quotation marks omitted).

To the extent that Gibbens challenges the ALJ's treatment of Dr. Szloboda's medical assessment rather than her conclusion that he is disabled, our review looks to whether the findings of the Commissioner are supported by the record as a whole. *Shelman v. Heckler*, 821 F.2d 316, 320 (6th Cir. 1987). The ALJ's consideration of the 20 C.F.R. § 404.1527(c)(2) factors was sufficient to enable our review on appeal. We find that the ALJ's weighing of Dr.

Szloboda's opinion—and his determination that it was not supported by medically accepted diagnostic techniques or objective evidence—for the four distinct reasons articulated in the decision, demonstrates that the ALJ considered the appropriate regulatory factors and is supported by substantial evidence. *See Key*, 109 F.3d at 273. [3]

### B.      Hypothetical Questions Posed To the Vocational Expert

In his second challenge to the decision, Gibbens contends that the ALJ did not provide the vocational expert with complete hypothetical questions that accurately incorporated limitations to Gibbens's concentration, persistence, and pace. In response, the Commissioner avers that the questions posed, and the decision's conclusion on residual functional capacity for sedentary work, were accurate and complete.

In addition to considering a claimant's subjective complaints and the objective medical evidence in the record, an ALJ may present hypothetical questions to a vocational expert "on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The ALJ may rely on the vocational expert's testimony in response. *See Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 596 (6th Cir. 2005) (citing 20 C.F.R. § 416.960(b)-(c)). In order to constitute substantial evidence that the claimant can perform work available in the national economy, the ALJ's questions to the vocational expert must "accurately portray[] [the claimant's] individual physical and mental impairments.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).

---

[3]To the extent Gibbens argues that the ALJ erred because, in disregarding Dr. Szloboda's opinion, he "failed to account for pain at all," that argument is unsupported by the record. The ALJ's opinion demonstrates that he considered Gibbens's claims of pain, and concluded that although Gibbens's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . [Gibbens's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in th[e] decision."

Gibbens argues that the ALJ's finding regarding his "moderate difficulties" with concentration, persistence, or pace were not reflected in questions to the vocational expert. To review, all three questions posed by the ALJ to the vocational expert contemplated a hypothetical individual who "would be unable to maintain the attention or concentration necessary to perform detailed or complex tasks" and was "unable to have more than occasional interaction with co-workers, supervisors, or the public." The third hypothetical added that the individual would need unscheduled breaks of undetermined duration. The first two limitations correlated to the ALJ's finding that Gibbens had "moderate difficulties" with regard to concentration, persistence, or pace, specifically that Gibbens "is functioning with borderline intellectual capabilities but has demonstrated the capacity for unskilled work."

Gibbens relies on *Ealy v. Commissioner of Social Security*, where we found that a vocational expert's testimony that Ealy could work in a number of unskilled jobs did not serve as substantial evidence for the ALJ's conclusion that Ealy could in fact perform such work because the hypothetical question posed to the vocational expert inadequately described Ealy's limitations. 594 F.3d 504, 517 (6th Cir. 2010). A state psychological consultant limited Ealy's ability to focus on a simple, repetitive task to two-hour segments in an eight-hour workday where speed was not critical. *Id*. at 516. On the basis of this opinion, and other record evidence, the ALJ determined that Ealy had "moderate difficulties" with concentration, persistence, or pace. *Id*. at 510. Despite this finding, the ALJ's hypothetical question asked the vocational expert, in relevant part, to "assume this person [is] limited to simple, repetitive tasks and instructions in non-public work settings." *Id*. at 516 (alteration in original) (internal quotation marks omitted).

On appeal, we distinguished Ealy's claim from that in *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), in which we upheld the ALJ's omission of a concentration limitation in a

hypothetical question where the ALJ found that the weight of the medical evidence went against the single physician who opined on that impairment. *Ealy*, 594 F.3d at 517. The ALJ considering Ealy's claim, however, accepted the assessment of the state psychological consultant and then "streamlined" the hypothetical to omit "these speed- and pace-based restrictions completely" such that the hypothetical question did not accurately portray Ealy's mental impairment. *Id*. at 516-17.

We agree with Gibbens that *Ealy* is applicable to the current case, but read it to support the Commissioner's position. Contrary to Gibbens's argument that the present hypothetical question conveyed only a limitation to simple, routine, or unskilled work, which "does not always equate with the difficulty of staying on task," we read the ALJ's proposed limitations regarding (1) an inability to concentrate and short attention span, and (2) limited capacity for interaction with others to directly reflect Gibbens's moderate difficulties with concentration, persistence, and pace based on his borderline intellectual capabilities.

The most conservative opinion regarding Gibbens's mental limitations comes from Michael Varney, allegedly a licensed clinical professional counselor who regularly met with Gibbens.[4] Varney completed a number of physical and psychological evaluations concluding that Gibbens had extreme mental and physical limitations.

The ALJ was highly skeptical of Varney, given a number of discrepancies in his background and opinion. While Varney called himself a "psychologist" in medical source statements, he was elsewhere identified as "LLP, CAP," and was referred to as a Licensed Clinical Professional Counselor by Gibbens's attorney. His psychological evaluations submitted in 2009 and 2010 appeared to be identical, with the exception of one alteration to the final

---

[4]Varney was also appointed Gibbens's representative for at least a portion of the administrative proceedings and filed the request for hearing on Gibbens's behalf.

paragraph. On this basis, the ALJ gave Varney's opinion that Gibbens could not perform any type of work "no weight whatsoever as there is no indication that Mr. Varney has any physical medical training at all." Gibbens does not challenge this conclusion on appeal.

The hypothetical questions posed to the vocational expert at the hearing fairly portrayed Gibbens's limitations as supported by objective evidence. *See Ealy*, 594 F.3d at 516. To the extent that the questions did not reflect the limitations offered by Varney, which were unique to the record in the extent to which they diminished Gibbens's mental functioning, the ALJ found his opinion to be not credible. Therefore, the ALJ was under no obligation to include Varney's limitations in his examination of the vocational expert. *See Casey v. Sec. of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) (noting it is "well established" that an ALJ need "incorporate only those limitations accepted as credible by the finder of fact" into hypothetical questions asked of a vocational expert).

Because the hypothetical questions adequately represented the ALJ's assessment of Gibbens's limitations in concentration, persistence, and pace, we find that Gibbens's second claim lacks merit. *See Longworth*, 402 F.3d at 596 (disposing of a claim that the ALJ's hypothetical failed to take into account claimant's shoulder problems when, in fact, the question described an individual who could not reach overhead or complete a task requiring heavy grasping because of shoulder limitations).

## IV. CONCLUSION

We arrive at our conclusion in this close case not on the basis that we agree with the Commissioner's decision, but rather, because the decision is supported by substantial evidence and was made pursuant to the prescribed legal standards—observation of the treating physician rule and good reasons requirement, credibility findings grounded in objective evidence and sufficient for subsequent review, and consideration of the entire record. Reasonable minds could

agree that the record evidence supports the determination that Gibbens, though impaired, retains the residual functional capacity to perform work. Therefore, we AFFIRM the judgment of the district court in favor of the Commissioner of Social Security.